1   JOSEPH T. MCNALLY
    Acting United States Attorney
2   LINDSEY GREER DOTSON
    Assistant United States Attorney
3   Chief, Criminal Division
    MARK A.  WILLIAMS
4   Assistant United States Attorney
    Chief, Environmental Crimes and Consumer Protection Section
5   DENNIS MITCHELL (Cal. Bar No. 116039)
    Assistant United States Attorney
6   Environmental Crimes and Consumer Protection Section
          1300 United States Courthouse
7         312 North Spring Street
          Los Angeles, California 90012
8         Telephone: (213) 894-2484
          Facsimile: (213) 894-6436
9         E-mail:   dennis.mitchell@usdoj.gov
    RYAN CONNORS (N.Y. Bar No. 4404901)
10  Senior Trial Attorney
    LAUREN STEELE (N.Y. Bar No. 4416814)
11  Trial Attorney
    Environmental Crimes Section
12        150 M Street NE
          Washington, DC 20002
13        Telephone: (202) 305-0363
          Facsimile: (202) 514-8865
14        E-Mail:   ryan.connors@usdoj.gov
          E-Mail:   lauren.steele@usdoj.gov
15

16  Attorneys for Plaintiff
    UNITED STATES OF AMERICA
17
                    UNITED STATES DISTRICT COURT
18
                FOR THE CENTRAL DISTRICT OF CALIFORNIA
19
    UNITED STATES OF AMERICA,          No.  2:24-CR-00161-JLS
20            Plaintiff,
                   v.                  GOVERNMENT'S SENTENCING POSITION;
21  SAI KEUNG TIN,                     EXHIBITS
        aka "SK Tin,"
22      aka "Ricky Tin,"               Hearing Date: March 14, 2025
        aka "Ji Yearlong,"             Hearing Time: 9:30 a.m.
23
              Defendant.
24

25

26        Plaintiff United States of America hereby files its sentencing

27  position paper regarding defendant SAI KEUNG TIN ("defendant").  As

28  described below, the government recommends the Court impose a

1  guideline sentence of 37 to 46 months of incarceration, a $7,200

2  fine, three years of supervised release, and a $400 special

3  assessment.  The government's position is based on the attached

4  memorandum of points and authorities, all the files and records in

5  the case, and on such further evidence or argument as may be

6  presented at the sentencing hearing.

7   Dated: February 28, 2025          Respectfully submitted,

8                                     JOSEPH T. MCNALLY
                                      Acting United States Attorney
9
                                      LINDSEY GREER DOTSON
10                                    Assistant United States Attorney
                                      Chief, Criminal Division
11

12            _____/s/_____
                                      Ryan Connors
13                                    Senior Trial Attorney
                                      Lauren Steele
14                                    Trial Attorney
                                      Dennis Mitchell
15                                    Assistant United States Attorney

16
                                      Attorneys for Plaintiff
17                                    UNITED STATES OF AMERICA

18

19  //

20  //

21  //

22  //

23  //

24

25

26

27

28

TABLE OF CONTENTS

<u>DESCRIPTION</u>                                                         <u>PAGE</u>

Memorandum of Points and Authorities..................................1

I.   Procedural History ..............................................1

II.  Facts  ..........................................................1

     a. Scope of Relevant Conduct ...................................1

     b. Indictment Conduct and Evidence of Defendant's Residence ....1

     c. Shipments to Defendant's Two Other Hong Kong Addresses ......3

     d. Defendant's Intended Illegal Conduct in the United States ..4

III. Guideline Calculations .........................................8

     a. PSR's Offense Level and Criminal History Calculations ......8

IV.  Analysis of the 18 U.S.C. § 3553(a) Factors ...................9

     a. Nature of the Defendant .....................................9

     b. Nature of the Offense .......................................10

     c. Punishment and Deterrence ..................................15

     d. Unwarranted Sentencing Disparity ...........................15

V.   Conclusion .....................................................19

TABLE OF AUTHORITIES

CASES                                                                  PAGE

*United States v. Cantore*, 2:14-cr-197 (E.D. La. 2015) ........... 18

*United States v. Guan*, 1:19-cr-463 (E.D.N.Y. 2022) .............. 18

*United States v. Freeman*, 5:20-cr-377 (E.D.N.C. 2022) ........... 18

*United States v. Kang*, 1:19-cr-107 (D.N.J. 2021) ................ 16

*United States v. Leger*, 1:17-cr-40 (E.D. Tex. 2017) ............. 18

*United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) .......... 9

*United States v. Treigle*, 2:14-cr-181 (E.D. La. 2014)........... 19

STATUTES

18 U.S.C. § 554.................................................... 1

18 U.S.C. § 3553................................................. 9,19

27 U.S.T. § 1087................................................. 11

GUIDELINES

U.S.S.G. § 2B1.1.................................................. 8

U.S.S.G. § 2Q2.1.................................................. 8

U.S.S.G. § 3E1.1.................................................. 8

U.S.S.G. § 4C1.1.................................................. 8

OTHER AUTHORITIES

"A Short Review of the International Trade of Wild Tortoises and Freshwater Turtles," L. Luiselli, *Chelonian Conservation and Biology* (2016)........................................................ 13

"Analysis of 20 years of turtle exports," T. Easter, *Conservation Science and Practice* (Jan. 16, 2024)............................. 13

"Disrupt Wildlife Cybercrime," J. Hastie, *International Fund for Animal Welfare* (May 2018)........................................ 11

"In Suriname, a shadowy hunt for traffickers," N. Miroff, *Washington Post* (Feb. 23, 2025)........................................... 11

"Operation Dragon," S. Stoner, *Wildlife Justice* Commission (2018). 15

OTHER AUTHORITIES (cont.)                                          PAGE

"State-wide population characteristics and long-term trends for
eastern box turtles," J. Roe, *Ecosphere* (Feb. 9, 2021)............ 13

"Summarizing US Wildlife Trade," K.M. Smith, *EcoHealth* (2017)..... 10

"Turtles are being snatched from the U.S.," D. Maron, *National
Geographic* (Oct. 28, 2019)........................................ 14

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

I.   <u>PROCEDURAL HISTORY</u>

3  Defendant was arrested at John F. Kennedy International Airport

4  in New York upon his arrival in the United States on February 25,

5  2024.  A Los Angeles federal grand jury returned an indictment

6  charging defendant with four counts of Smuggling Merchandise Contrary

7  to Law (18 U.S.C. § 554) on March 8, 2024.  Defendant pleaded guilty

8  to the indictment on December 13, 2024.  The government and defendant

9  agreed on a joint factual statement ("JFS" Dkt. 33) relating to the

10  conduct charged in the indictment but not to relevant conduct.  There

11  is no plea agreement in place between the parties.

12

II.   <u>FACTS</u>

13  A.   <u>Scope of Relevant Conduct</u>

14  One of the main questions for the Court is the breadth of

15  defendant's relevant conduct.  The government and defendant agree

16  that defendant aided and abetted the smuggling of turtles to his

17  residential address in Hong Kong ("Address #1").  As described below,

18  the government contends that defendant used two additional addresses

19  to facilitate wildlife trafficking.

20  B.   <u>Indictment Conduct and Evidence of Defendant's Residence</u>

21  The indictment charged defendant with aiding and abetting the

22  smuggling of four packages from the Central District of California to

23  Hong Kong on June 22 and 23, 2023. PSR at 9.  Defendant did not ship

24  the packages himself but received them at his Hong Kong residence,

25  Address #1. PSR at ¶ 12, JFS at 3.  The packages contained a total of

26  40 eastern box turtles and were falsely labeled as containing almonds

27  or chocolates. PSR at ¶ 12.  Defendant "knew the export was

28

1

fraudulent and contrary to law in that it did not contain the required CITES permit, declaration, or accurate label and was not presented to inspection." JFS at 3.

The parties agree that the Asian fair market retail value of the turtles involved in this case was $2,000 per turtle.  PSR at ¶ 8.  Thus, the value for these four packages was $80,000.

The special agent in charge of the investigation, Ryan Bessey of the U.S. Fish and Wildlife Service, will be available to testify at the sentencing hearing.  If called, he will state that the turtles in the packages were bound in black socks and some had their legs taped within their shell.  This is a common tactic amongst turtle smugglers: the socks absorb feces and urine and restricting the turtles' movement prevents them from scratching at the box, which could alert authorities.  The below photographs depict one of the June 24 packages.

 

The packages were addressed to Ji Yearlong at Address #1. Special Agent Bessey reviewed postal and export records that showed 67 packages were sent from the United States to Address #1 between February 2018 and June 2023.  U.S. Fish and Wildlife Service and customs inspectors seized or examined 29 of the shipments.  They all

2

contained turtles bound in socks and were falsely labeled as clothing, food, or household items.  Each shipment contained on average 10 turtles, most of which were eastern box turtles.  The packages were addressed to defendant, using variations of the names Ricky Tin, Sai Keung Tin, or SK Tin, or to Ji Yearlong, also spelled Ji Yerong, with a phone number ending in 2309.  A review of defendant's cell phone showed numerous messages to that phone number listed under the contact name Ji Yerong to discuss turtle shipments, photographs of shipped turtles, and a conversation about defendant's trip to the United States.

Applying an average of 10 turtles per shipment to the 67 packages and a valuation of $2,000 per turtle, the market value of these shipments is the $1,340,000 cited by defense counsel in defendant's sentencing memo.  Dkt. 39 at 5.  The government agrees with this valuation but seeks to include additional shipments.

C.    Shipments to Defendant's Two Other Hong Kong Addresses

The government separately prosecuted Kang Juntao, a turtle trafficker in mainland China who directed and financed U.S. shippers to smuggle turtles to Hong Kong.  The Kang case is described in detail in the below section regarding sentencing disparity.  Between August 2017 and February 2018, Kang directed U.S. shippers, including undercover special agents, to export turtles bound in socks to another residential address in Hong Kong ("Address #2").

Shippers sent 40 packages to Address #2 during this six-month window.  All 40 packages were addressed to a spelling variation of Sai Keung Tin or Ricky Tin.  Inspectors seized or examined 22 of the packages and found turtles falsely labeled as clothing or household

3

objects.  Each package contained on average 10 turtles, most of which were eastern box turtles.  The government contends that defendant used Address #2 until he moved to Address #1 in February 2018; this is the same month when the shipments changed from Address #2 to Address #1.  There were no shipments to Address #2 after February 2018.  Using the same valuation, the 40 shipments represent 400 turtles with a market value of $800,000.

Also beginning in February 2018 and continuing through May 2020, 103 packages were shipped to another Hong Kong residential address ("Address #3").  Inspectors seized or examined 68 of the packages, which contained 10 eastern box turtles on average.  The turtles were bound in socks falsely labelled as clothes, toys, and household items.  Kang directed U.S. shippers to send turtles to both Address #2 and Address #3.

Fifty-one of the packages sent to Address #3 were addressed to Ricky Tin.  The remaining packages were addressed to various spellings of Ji Yearlong.  Most of the packages did not have a phone number listed for the recipient, but 14 of them listed the same phone number ending in 2309 that was listed on other packages sent to Ji Yearlong at Address #1.  During this time period defendant also communicated with that phone number about turtle trafficking.

The 1,030 turtles sent to Ricky Tin and Ji Yearlong at Address #3 had an estimated market value of $2,060,000.  The total market value for the three addresses is the $4,200,000 amount listed in the PSR guidelines. PSR at ¶ 31.

D.    <u>Defendant's Intended Illegal Conduct in the United States</u>

Pursuant to a search warrant, the government reviewed the

4

contents of two phones seized from defendant at the time of his

arrest.[1] The messages therein made clear that defendant had traveled

to the United States to further an ongoing wildlife trafficking

scheme.  Prior to traveling, defendant had communicated with friends

and family about his trip and its purpose.  On February 16, 2024,

defendant discussed with Jin Yerong the prospect of traveling to the

United States at the request of someone whose name translates as

"Turtle Big Brother." Exh. 1 at TIN_0010422.  He further stated that

the "minimum pay is $30,000," plus "USD$1,000 per package shipped to

Hong Kong." *Id.* at TIN_0010423.  Defendant acknowledged his role as a

recipient of and conduit for contraband and says that "we are not

receiving packages anymore.  I will be paid USD$1,000 for shipping."

*Id.* at TIN_0010424.  Defendant planned to be in the United States for

approximately two months. *Id.* at TIN_0010427.  He later met with a

contact he referred to as the "Turtle guy," who provided him with

luggage to use, and also sent detailed instructions on how to operate

in the United States. *Id.* at TIN_0010432.  Defendant also indicated

that his trip would involve multiple rounds of travel between

destinations in the United States, commenting at one point that "I

will fly to seattle from el paso [sic] (Texas) several times." Exh. 2

at TIN_0010544.

    Among the chats recovered from defendant's phones was an ongoing

WhatsApp conversation between defendant and an accomplice dating back

to June 2021 (attached as Exh. 3 and 4).  On February 18, 2024,

defendant messaged the accomplice, "I agree to go to the U.S. and

---

[1] The content of these phones was Chinese and translated to English by a certified interpreter with Language on Demand, Inc.  All quotes represent the English translation.  The original messages are attached as Exhibits 1-4 and previously disclosed in discovery.

work with you." Exh. 3 at TIN_0010634.  After agreeing to travel to the United States to take on a new role in the turtle smuggling enterprise, defendant received detailed instructions from his accomplice. *Id.* at TIN_0010640.  Defendant later shared these instructions with others.  The instructions spanned the first five days of his two-month trip to the United States and included information on contacts he would be meeting with, packing supplies he would need to purchase, and tips for performing reconnaissance at various shipping locations to avoid detection of his smuggling activities.

Defendant's accomplice told him that upon arriving in New Jersey he should purchase "50 pairs of thin socks, 6 rolls of kitchen paper towel, two large bath towels, and 6 rolls of large scotch tapes," which "is only good for one time for about 30 pieces." Exh. 4 at TIN_0010611.  Defendant also planned to meet with a contact who would assist him in shipping test packages from various locations to himself so he could familiarize himself with the process.  Defendant was instructed to "Bring one completely packed box into the UPS Store and ship it.  While doing this, observe what the staff ask and what information you need to provide.  Ship the items to the UPS Store in El Paso, Texas."[2]  *Id.*  To prevent creating a paper trail, "Remember never put the barcode and receipt of the item in the box." *Id.*  For a test international shipping run, he was told that "these boxes are clean and there is no need to worry about leaving the records," so he should use a credit card for payment "to minimize cash use." *Id.* at TIN_0010612.  When arrested in New York, defendant had $7,200 in cash

---

[2] Based on context, the "items" would be turtles that Tin had already picked up from a contact he intended to meet in New Jersey.

in his possession to pay for expenses and the turtle shipments.
Authorities seized this money, and the government recommends the
Court issue a fine in the same amount.

After shipping these packages to himself, defendant's plan was
to fly to El Paso.  His preliminary instructions there were to pick
up the packages, scout locations to buy more supplies, and find a UPS
store from which to make a shipment to Seattle the following day.  He
also planned to pick up "the goods" from a contact in El Paso. *Id.*
He was also instructed to soak "the goods" in water that evening for
15 minutes and let them dry, which is a common practice among
individuals trafficking in turtles to reduce odors and hydrate the
turtles prior to shipment.  *Id.*  The following morning, he would pack
the turtles up, using the supplies he had purchased.  He was told to
"observe how they make the sound in the day and make improvements
accordingly." *Id.* at TIN_0010613.  At 3:30 p.m., he would take the
package to the UPS Store to ship it to himself in Seattle.  *Id.*
After traveling to Seattle, defendant would pick up the package
containing the turtles and take it to a hotel.  Once there, he was
"to check whether there are any socks urinated, change to dry socks
if yes." *Id.*  He was instructed to leave the turtles at the hotel and
buy additional boxes and socks to send them to Hong Kong.  *Id.*

From defendant's correspondence, it was clear that El Paso and
Seattle were critical to the turtle trafficking enterprise.  Both
cities figured prominently in Tin's travel plans, as his accomplice
told him, "You need to become more familiar with these two cities."
*Id.*  Defendant's contact also told him to identify scenic spots where
a tourist might go in the vicinity of where he was staying, because

7

"If you're picked, they will have you in a room and you will need to answer the questions about your itinerary." Exh. 3 at TIN_0010676.

These messages establish that defendant's purpose in traveling to the United States was to knowingly engage in turtle smuggling and he communicated openly about it. He was aware of the illicit nature of his activities and received specific tips on how to avoid detection. He followed those tips when apprehended by providing false information regarding his plans while visiting the United States. Though defendant agreed to speak with investigators when stopped at JFK International Airport, he denied knowing anything about packages being sent to him in Hong Kong. Defendant followed his associate's tips on misleading investigators, telling them that he was visiting the U.S. as a tourist on vacation, claiming he planned to travel to Los Angeles. He also denied knowing Ji Yearlong, even though WhatsApp messages in his phone showed frequent romantic communication and discussion of turtle trafficking between the two.

III.   GUIDELINE CALCULATIONS

A.   PSR's Offense Level and Criminal History Calculations

| | | | |
|---|---|---|---|
| Base Offense Level | : | 6 | U.S.S.G. § 2Q2.1 |
| Pattern of Similar Violations | : | +2 | U.S.S.G § 2Q2.1(b)(1)(B) |
| Value of Wildlife | : | +18 | U.S.S.G §§ 2Q2.1(b)(3)(A)(ii) & 2B1.1(J) |
| Acceptance | : | -3 | U.S.S.G. § 3E1.1 |
| Zero Point Offender | : | -2 | U.S.S.G. § 4C1.1 |
| Total Offense Level | : | 21 | |

The government agrees with the PSR's offense level calculation. Based on a total offense level of 21 and a criminal history category of I, the guideline range is 37-46 months of imprisonment. The government concurs with the PSR that defendant is in criminal history category I as there is no way to verify whether or not defendant has a criminal record in China.

IV.   ANALYSIS OF THE 18 U.S.C. § 3553(a) FACTORS

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by the sentencing court to impose a "sentence sufficient, but not greater than necessary." The Court uses a preponderance of the evidence standard when applying factual determinations to the guidelines. *United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024)(en banc).

A.   Nature of the Defendant

For over six years, defendant was instrumental in smuggling turtles from the United States to Hong Kong.  He received hundreds of packages containing thousands of inhumanely bound turtles, which were later smuggled into mainland China.  Despite U.S. authorities' constantly seizing shipments, defendant and his accomplices continued to violate the law so they could profit at the expense of U.S. native wildlife species.

Defendant was more than a passive, minor recipient.  When given the chance, he jumped at the opportunity to travel to the United States to take on a more active and lucrative role.  He agreed to travel across the globe to meet illegal suppliers and ship the reptiles himself.  In doing so he researched alibis if he was caught

and misled law enforcement when he was detained.  He planned to spend two months away from his homeland, which he would not do if it were not in his financial interest. His plan in travelling from New Jersey to Texas to Washington State was to evade authorities and test weakness in the postal system.  Like many of the other shipments sent to his Hong Kong addresses, the packages were routed through the International Mail Facility in Los Angeles.

As mentioned above, defendant worked for Kang Juntao, who was sent to federal prison for financing turtle trafficking.  Defendant likely knew this, as his contact with Kang abruptly ceased when Kang was arrested and defendant pivoted to work with others within the network.  A guideline sentence is necessary to specifically deter defendant from this illegal scheme.

Defendant has demonstrated that he was willing to put his personal enrichment over the rule of law and to the detriment of other living animals.  His history and characteristics support a sentence of incarceration as recommended by the guidelines.

B.   Nature of Offense

Defendant was a part of the underground wildlife trade, which is lucrative and rivals better-known criminal activities.  In 2017, when defendant first began trafficking turtles, "[t]he illegal aspect of wildlife trade [was] estimated to be a $5-20 billion dollar industry, comparable to the international trade of narcotics and weapons."[3] It

---

[3] "Summarizing US Wildlife Trade with an Eye Toward Assessing the Risk of Infectious Disease Introduction," K.M.  Smith, et al., *EcoHealth* (2017).

has only increased since then.  "The wildlife trade generates $23 billion a year for transnational criminal organizations, according to HSI [U.S. Homeland Security Investigations], whose estimate includes parallel sales in illegal timber.  The agency ranks wildlife trafficking as the fourth-largest source of illicit revenue globally after drugs, human smuggling and counterfeit goods.  It is an example of what the U.S. government describes as 'crime convergence' — multiple sources of illegal revenue that can create more paths to take down the same structure."[4]

Many are surprised that reptiles in particular are trafficked in such large volumes.  A 2018 study of the illegal wildlife trade from Europe found that "reptiles were by far the most numerous protected specimens identified, with live tortoises and turtles, in particular, representing 45% of specimens."[5]  By comparison, elephant ivory represented 11 percent of this illegal market.  *Id.*

Defendant primarily trafficked in eastern box turtles, along with a few other North American species.  There is a web of state, federal, and international laws that regulate the trade in these turtles.  This includes the multilateral treaty called the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), which protects these species of turtles.  27 U.S.T.  1087,

---

[4] "In Suriname, a shadowy hunt for traffickers selling jaguar parts to China," Nick Miroff & Carolyn Van Houten, *Washington Post* (Feb.  23, 2025).

[5] *Disrupt: Wildlife Cybercrime*, Jo Hastie, *International Fund for Animal Welfare* (May 2018).

T.I.A.S.  8249.  The United States, China, and approximately 182 other countries are signatories to the treaty.  CITES provides a mechanism for regulating international trade in species whose survival is considered threatened by trade.  All the species of turtles defendant trafficked are listed in Appendix II of CITES, which lists wildlife, fish, and plant species that are not presently threatened with extinction but may become so if their trade is not regulated.  CITES does not classify species as endangered, protected, or threatened.  Under Appendix II of CITES, a species may be exported from a country only if, prior to exportation, the exporter applies for and obtains a valid CITES export permit issued by the country of export.  These permits are only granted if the shipper can show the wildlife was lawfully acquired and the Division of Management Authority determines it is not detrimental to the native population. Valid institutions such as universities or zoos typically receive the permits.

U.S. authorities would not have granted export permits for these turtles in the commercial pet trade. When defendant and his accomplices smuggled the turtles, they deprived the scientific community of the data needed to know how frequently these species were traded and from where.  "These details are crucial for management decisions, especially since CITES is designed to consider trade at both the individual species level and at broader taxonomic

12

levels,"[6] such as all turtles or reptiles.

With good reason, CITES is one way the international community attempts to stem the illegal collection of turtles.  Poaching is a threat to the survivability of many turtle species and is "the second largest threat for reptile species worldwide.  Among reptiles, turtles and tortoises represent the most threatened group of vertebrates worldwide."[7] Eastern box turtles help disperse seeds and spores in their habitats and are prey for other wildlife; "Eastern box turtle populations have declined and require conservation action… [t]he decline of this species would thus represent a significant loss to both turtle biodiversity and ecosystem function."[8] Defendant was part of a larger illicit market for turtles native to the United States.

In addition to demand from perceived traditional medical benefits in Asia, these turtles are coveted by many in China as pets.  "[W]ith newfound wealth in the region… turtles are just another rare, coveted item to collect, like wine, fine art, and cars.  Demand has already wiped out large number of native turtles in Asia, making American

---

[6] "Analysis of 20 years of turtle exports from the US reveals mixed effects of CITES and a need for better monitory," Tara Easter & Neil Carter, *Conservation Science and Practice* (Jan.  16, 2024).

[7] "A Short Review of the International Trade of Wild Tortoises and Freshwater Turtles Across the World and Throughout Two Decades," L. Luiselli, et al., *Chelonian Conservation and Biology* Vol. 15, No. 2 (2016).

[8] "State-wide population characteristics and long-term trends for eastern box turtles in North Carolina," John Roe, et al, *Ecosphere* (Feb. 9, 2021).

turtles even more attractive."[9] Turtles are particularly vulnerable to poaching given how late they reach sexual maturity, the low survival rate of eggs and hatchlings, and environmental pressures from climate change, vehicle traffic, and habitat loss: "Because popularly targeted adult species can take five years or more to reach reproductive age, drawing down adult populations for the pet market could cause a species to collapse quickly – perhaps even before biologists and law enforcement become fully aware of the problem." *Id*. An eastern box turtle may not be as iconic as a rhinoceros or tiger, but there was real harm in smuggling thousands of a species, especially when breeders prioritized obtaining female turtles to breed in Asia.

The government disagrees with defendant that this case did not involve animal cruelty or mistreatment. Dkt. 33 at 10. Like all reptiles, turtles are cold-blooded and cannot regulate their own body temperature. They are vulnerable when exposed during shipping to hot or cold temperature swings, especially when trapped in socks in packages that can lay on tarmacs and warehouses for days. Many of the turtles were also bound with tape to prevent them from moving or scratching. Turtles that died in transit were a cost of doing business for defendant. There are humane shipping methods available for turtles which include ample room to move, veterinary preclearance, prominent labels that a living animal is in the

---

[9] "Turtles are being snatched from the U.S. waters and illegally shipped to Asia," Dina Fine Maron, *National Geographic* (Oct. 28, 2019).

container, and restrictions on temperatures.  Defendant and his abettors instead chose to mislead customs by labelling them as food and binding them.

C.   Punishment and Deterrence

The Court's sentence should reflect the scope and seriousness of this offense, and the need to promote respect for the criminal laws in the Central District of California.  Indeed, the recommended guideline sentence of incarceration is necessary for both specific deterrence of defendant and deterrence of others who would commit a similar offense.  In this case, the Court has the rare opportunity to sentence the individual who is directly responsible and has directly profited from reptile trafficking.  "[I]t is rarely the trade coordinator that is held accountable.  Historically it has been the low-level couriers who are apprehended, and prosecutions are uncommon, which provides little meaningful deterrent or impact on the proliferation of the trade itself."[10]

The government also recommends a $7,200 fine to disgorge a fraction of the profits that defendant made from wildlife trafficking.

D.   Unwarranted Sentencing Disparity

Reptiles are regular victims of the wildlife trafficking trade. According to Department of Justice records, in the past 10 years,

---

[10] "Operation Dragon: Revealing new evidence of the scale of corruption and trafficking in the turtle and tortoise trade," S. Stoner.  *Wildlife Justice Commission* (December 2018).

15

there have been at least 130 smuggling and Lacey Act wildlife trafficking convictions for selling or false labeling turtles alone. The government agrees with defense counsel that the Kang Juntao case is relevant to the Court's consideration in determining an appropriate sentence. *See United States v. Kang Juntao*, 1:19-cr-107, (D.N.J. 2021).

Kang was near the top of a wildlife trafficking operation in China that sought to recruit poachers and shippers in the United States to smuggle turtles to Hong Kong.  Defendant was part of that network; he would receive the smuggled turtles which were then reshipped to mainland China for the illegal pet trade.  Between June 2017 and December 2018, Kang trafficked about 1,500 protected turtles valued at approximately $2.25 million.

Kang was arrested in January 2019 in Malaysia.  He was extradited to the United States and pleaded guilty to money laundering.  He could not be charged with smuggling due to the details of the U.S. extradition treaty with Malaysia.  He was sentenced to 38 months in prison and a $10,000 fine, which represented the total of his U.S. assets.

There were certainly aggravating factors in the Kang case that do not apply to defendant.  Kang was an organizer, who recruited co-conspirators, taught them how to smuggle turtles, and directly profited from the trade.  He moved a large volume of turtles in a short 18-month window.

Defendant worked with accomplices, but there is no evidence that he was a leader.  However, defendant's conduct spanned from his involvement with Kang in August 2017 through his arrest in February 2024.  His offense conduct lasted nearly quadruple the time that Kang operated.  He aided and abetting the smuggling of $2 million more of turtles than Kang using the identical $2,000 per turtle valuation. Kang had never stepped foot in the United States, but Tin escalated his role by traveling to the United States. He was an active player who planned to directly meet with suppliers, ship the turtles around the country, and ultimately export them.

In handing down a guideline sentence, the Honorable Renée Marie Bumb reflected on the seriousness of Kang's offense and the need for deterrence that should also apply to defendant:

> Let me turn to the need to reflect the seriousness of
> the offense.  I find that this was a sad but sophisticated
> smuggling scheme.  I think that Mr. Kang's role was that
> of the orchestrator and he had others who played the
> instruments for him.  And it was very sophisticated. It
> spanned the country, involved middlemen, suppliers,
> students, and he used all kinds of social media, changed
> bank accounts, and other transactions to avoid detection.
> So, this wasn't a one-deal scheme, it was quite the
> opposite, a very sophisticated and complicated scheme. It
> was done in an inhumane manner on top of it.
>
> I think a guideline sentence is called for because it --
> the message has to be sent to those who are contemplating
> wildlife trafficking, the smuggling of these turtles, that
> they will be dealt with, that the crime will be dealt with
> and that they will be punished sufficiently.  So, I think a
> guideline sentence does address, in particular, general
> deterrence, and hopefully specific deterrence.
>
> There are several other cases that the Court may find persuasive

17

in imposing a just sentence that is akin to similarly-situated defendants.

A federal judge in North Carolina sentenced defendant Jesse James Freeman to 15 months in prison and a $25,000 fine for poaching at least 722 eastern box turtles, which he sold to middlemen to ship to Asia.  The turtles were worth approximately $1.5 million in the Chinese illegal pet market. *United States v. Freeman*, 5:20-cr-377, (E.D.N.C. 2022).

In another case, two New York brothers were sentenced to incarceration for trafficking in protected North American turtles, including eastern box turtles.  The court sentenced defendants Chu Sen Guan and Chu Wei Guan to 12 months and one-year-and-a-day in prison on a conspiracy charge for selling about 635 turtles to Hong Kong. *United States v. Chu Sen Guan, et al.*, No. 1:19-cr-463, (E.D.N.Y 2022).

In *United States v. Travis Leger et al*, the court sentenced two of the defendants to 21 months and 16 months incarceration respectively for conspiring to traffic turtles.  The defendants poached alligator snapping turtles from Texas and resold them in Louisiana.  The court also ordered the defendants to pay Texas $22,431 in restitution. No. 1:17-cr-40, (E.D. Tex. 2017).

In *United States v. Keith Cantore*, the court sentenced the defendant to 41 months incarceration and $42,805 in restitution for illegally purchasing approximately 100 wood turtles.  The defendant

had a previous conviction for selling turtles. No. 2:14-cr-197, (E.D. La. 2015).

In *United States v. Lawrence Treigle*, Treigle pleaded guilty to conspiracy to violate the Lacey Act.  He was part of a group of individuals that captured protected wood turtles from their Pennsylvania habitat.  He would then ship the turtles to Hong Kong using false package labels, earning over $200,000.  The court sentenced him to 15 months' incarceration and two years of supervised release. No. 2:14-cr-181, (E.D. La. 2014).

The government's recommendation of a guideline sentence is appropriate in that it ensures that defendant is treated similarly to other defendants who have sought to profit from the illegal turtle trade.  It would also meet the goals Congress set forth in § 3553 that would be "sufficient, but not greater than necessary."

## V.    CONCLUSION

In light of defendant's extensive criminal conduct spanning six years, the government believes that the factors set forth in 18 U.S.C.  § 3553(a) will be met by a guideline sentence of 37 to 46 months of imprisonment, a three-year period of supervised release, a fine of $7,200, and a special assessment of $400.